IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

DANNY PETERS, et al.,

                 Plaintiffs,

v.                                 CIVIL ACTION NO.   2:15-cv-15609

KC TRANSPORT, INC., et al.,

                 Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiffs' Motion to Remand and Motion to Expedite, Defendant Gary Corns' Motion to Dismiss, and an unopposed motion by Defendants Blackhawk Mining WV, LLC, Gary Corns, and Hampden Coal, LLC for leave to supplement Defendants' Response to Plaintiffs' Motion to Remand.   For the reasons discussed herein, the Court **DENIES** the motion for leave to supplement, (ECF No. 36), and Plaintiffs' remand motion, (ECF No. 11), **GRANTS** Defendant Corns' motion to dismiss, (ECF No. 6), and **DENIES AS MOOT** Plaintiffs' motion for expedited consideration of their remand motion, (ECF No. 31).

## I.      Background

This case concerns the intersection of the defendants' coal mining and trucking activities and the plaintiffs' property rights.   Plaintiffs Danny and Dreama Peters are lifelong residents of Logan County, West Virginia and, since August 2006, have lived at an address "near the mouth of Accoville Hollow Road, Country Road 16/1" in Accoville, West Virginia.   (ECF No. 1, Ex. 1 (the

"Complaint") at ¶¶ 1, 6, 22.)   Accoville Hollow Road is also home to a coal mine which is currently owned (along with other corporate entities not named as defendants in this case) by Defendant Blackhawk Mining WV, LLC ("Blackhawk") and operated by Defendant Hampden Coal, LLC ("Hampden").   (*Id.* ¶¶ 3–4.)   The coal mine is alternatively known as the Buffalo Gas No. 2 Deep Mine and the Washington Mine, and will hereinafter be referred to as the Washington Mine.   In addition, Blackhawk owns and controls, and Hampden operates, a coal preparation plant ("Mingo No. 1") "where Hampden sends the coal from the Washington Mine for beneficiation." (*Id.* ¶ 3.)   Defendants assert, and Plaintiffs do not contest, that both Hampden and Blackhawk are Delaware limited liability companies and that neither company has any members that are citizens of West Virginia.[1]   (ECF No. 1 (Def.'s Notice of Removal) ¶¶ 8–9.)

Defendants' coal mining operation involves the transportation of coal mined in the Washington Mine to other locations, including the Mingo No. 1 preparation plant, for processing and, eventually, sale.   Plaintiffs allege that the Washington Mine was opened at some point after they moved to Accoville Hollow in 2006[2], and that "[b]y April 24, 2015," the mine was officially listed by the West Virginia Department of Environmental Protection as "moving coal."   (*Id.* ¶ 27.) Around this same time, the permits to operate the Washington Mine were transferred to Blackhawk and Hampden and Blackhawk began to "run coal" on Accoville Hollow Road.   (*Id.* ¶¶ 24, 26–

---

[1] Plaintiffs allege that Blackhawk is a "West Virginia corporation" with principal place of business in Lexington, Kentucky.   (ECF No. 1, Ex. 1 ¶ 4.)   In their notice of removal, however, Defendants assert that Blackhawk "was, at the commencement of this action and continuing through the present time, a limited liability company organized under the laws of the state of Delaware."   (ECF No. 1 ¶ 9.)   Plaintiffs do not challenge this jurisdictional assertion or otherwise argue, in support of their motion to remand, that diversity does not exist between themselves and Blackhawk.

[2] Specifically, Plaintiffs allege that "[w]ithin a brief time after [they] were relocated to their present location in Accoville, Patriot Coal Corporation's Coyote Coal, LLC, announced its intentions of opening an underground mine" at the location in question.   (ECF No. 1, Ex. 1 ¶ 23.)   Plaintiffs do not name either Patriot Coal or Coyote Coal as defendants in this lawsuit.

27.)   Coal trucks are the preferred method by which the defendant mining companies "move" their coal from one place to another.   In order to facilitate this process, they enlisted the services of Defendant KC Transport, Inc. ("KC Transport"), a business that "provid[es] trucking services to the coal mining industry."   (*Id*. ¶ 2.)   Plaintiffs allege that KC Transport has its principal place of business in West Virginia.   (*Id*.)   Defendants, on the other hand, assert that KC Transport's principal place of business is in Virginia and that the corporate entity is "a citizen of Virginia for purposes of diversity jurisdiction."   (ECF No. 1 ¶ 7.)

After negotiations with the mining defendants, KC Transport established an industrial trucking operation on the property immediately adjacent to Plaintiffs' home.   (*Id*. ¶¶ 28, 31–33.) KC Transport "haul[s] coal from the Washington Mine to the Mingo No.1 coal preparation plant," (*id*. ¶ 34), and the purpose of the facility that currently operates next door to the plaintiffs is to store and maintain the coal trucks and related equipment that Blackhawk and Hampden use to transport coal out of the Washington Mine.   (*Id*. ¶ 33–34.)   Throughout the Complaint, Plaintiffs refer to KC Transport's trucking facility as the "Staging Area."

The current dispute arises from the alleged impact that Defendants' transportation of coal has had on Plaintiffs' property.   Plaintiffs state that the purpose of the instant lawsuit is "to remedy the damage caused by Defendants unlawfully operating a coal trucking route, and a major Staging Area and maintenance lot for coal trucks, immediately adjacent to the Plaintiffs' home in a residential community."   (ECF No. 1, Ex. 1 at 1.)   Specifically, Plaintiffs object to the placement of the coal road in question, arguing that it should not be placed in such close proximity to their home when other less intrusive routes are readily available.[3]   (*See id*. ¶ 74 (alleging that the

---

[3] Plaintiffs' allegations on this point lack clarity.   They appear to allege that the defendants played some role in determining the current coal road's location, although they do not provide any specifics on this point.   They also

3

defendants are in violation of various state statutory provisions as the result of "declining to develop their haul road so that it connects to Route 10 directly, and by instead routing excessive truck traffic through the small residential neighborhood on Accoville Hollow Road").   Plaintiffs also complain about the mining defendants' failure to properly wash and cover their coal trucks, a failure which has allegedly led to multiple state statutory violations.   (*Id*. ¶ 52–53.)

The primary grievance, however, is the nuisance created by KC Transport's coal truck maintenance operation.   According to Plaintiffs, every day from "Monday through Saturday, beginning at about 6:00 or 6:30 [a.m.], seven to eight trucks are idling and moving around the Staging Area."   (*Id*. ¶ 38.)   These trucks are often fully loaded with coal when they arrive for maintenance, and Plaintiffs' allege that they are frequently "left idling for over two hours at a time . . . so that on the Peters' porch they can smell the diesel fumes."   (*Id*. ¶ 41–42.)   In addition, Plaintiffs allege that KC Transport's servicing operation is a noisy business that operates heavy machinery in a manner that "causes a loud and clattering noise" and makes repairs "that sound like the banging of a sledge hammer on metal."   (*Id*. ¶ 40.)   In addition to the noise created by the various maintenance activities, Plaintiffs allege that the defendants' activities at the staging area have caused thick layers of dust to accumulate on Plaintiffs' vehicles, house, and personal property.   (*Id*. ¶ 45.)   Finally, Plaintiffs allege that KC Transport has located "two foul-smelling porta-potties right in front of [their] home when there are numerous other suitable locations for those porta-potties."   (*Id*. ¶ 50.)

---

allege, however, that the defendant coal mining companies did not gain their permits to operate the mine in question until 2015, roughly nine days before coal truck traffic is alleged to have begun, so it is difficult to imagine that these defendants would have had time to plan and construct the road in question in such a short period of time.   (ECF No. 1, Ex. 1 ¶¶ 24, 27.)

Such is the general structure of the Complaint—it is directed at the alleged injury to property created by (1) KC Transport's operation of a coal trucking staging area next door to Plaintiffs' home, and (2) the coal mining defendants' failure to clean, cover, and appropriately manage their coal trucks as they operate on a haul road through Plaintiffs' neighborhood. None of this activity is alleged to have been undertaken by any individual personally. The Complaint does, however, name one individual defendant in addition to the corporate entities described above: Gary Corns, Blackhawk's "land manager" with "responsibility for representing the land interests of both Blackhawk and Hampden." (*Id*. ¶ 5.) There are no allegations that Corns either personally engaged in any of the offensive activities identified in the Complaint as harming Plaintiffs' property or had the authority to direct or control those activities. Rather, as the Complaint makes clear, Corns' role at Blackhawk was to represent the land interests of the coal mining defendants and negotiate with landowners who might be affected by coal-related operations.

Accordingly, Plaintiffs' specific allegations with respect to Corns emphasize his representations as a negotiator; Corns is named in this complaint because he "previously coordinated a relocation agreement," involving the plaintiffs and in response to a similar coal industry nuisance, and represented that "no such industrial nuisance would occur near the new home in Accoville."[4] (*Id*. at 1.) Despite these prior representations, Blackhawk and Hampden began running coal near the plaintiffs' new home. As a result, they had Corns meet with "an individual named Kenny Compton regarding the possibility of bringing an industrial trucking

---

[4] Plaintiffs frequently reference that the subdivision to which they relocated in Accoville was subject to restrictive covenants preventing any industrial usage. (*See, e.g.*, ECF No. 1, Ex. 1 ¶ 19.) They do not, however, submit any documentation of these covenants for the Court's review or assert any claim based on the breach of this covenant or any other contract.

operation to the property immediately adjacent to Mr. and Mrs. Peters' new home," (ECF No. 1, Ex. 1 ¶ 28), and negotiate with the plaintiffs about once more relocating.  Sometime after those meetings, the Complaint alleges, Kenny Compton and KC Transport set up the truck maintenance facility at issue.  Beginning on August 27, 2015, Kenny Compton, who is not named as a defendant to the current action, "has maintained a general presence on the site in a supervisory capacity, managing the workforce and the traffic of the trucks for KC Transport's business."[5]  (*Id.* ¶ 34.)

On the basis of these allegations Plaintiffs assert claims for nuisance, trespass, negligence, prima facie negligence based on alleged violations of public safety statutes governing surface

---

[5] The following is a complete list of the Complaint's references to Corns by name, many of which detail events that occurred more than ten years prior to the filing of the instant Complaint:

- In 2005, Corns, on behalf of his employer INR Energy, assumed responsibility for developing a relocation agreement with the plaintiffs in response to concerns about a coal industrial nuisance. (ECF No. 1, Ex. 1 ¶ 16.)
- Corns worked with another official, Bob Van Hoose at Appalachian Resources, LLC, to locate a piece of land that could serve as a new residential subdivision for plaintiffs to live in.  Once this land was identified, Corns took the plaintiffs to that site and "explained how the subdivision would be developed with the express covenant that the property would constitute a common plan for residential development and would preclude industrial usage in order to prevent [the plaintiffs] from suffering from the very type of nuisance that they were seeking to get away from."  (*Id.* ¶ 19.)
- Based on these representations, Corns (along with Van Hoose) "caused [the plaintiffs] to believe that they were moving to a location where they would never have to worry about living amidst the loud racket, dust, and diesel fumes of a coal mine or other industrial operation ever again."  (*Id.* ¶ 20.)
- Corns was present when the plaintiffs signed a relocation agreement in 2005 and had "personal knowledge of the documents recording the restrictive covenant against industrial usage on the property from which the common plan was drawn."  (*Id.* ¶ 21.)
- Ten years later, on April 22, 2015, Corns, now working for Blackhawk, approached the plaintiffs at their new home, notified them that Blackhawk intended to "run coal on Accoville Hollow," and offered to relocate the plaintiffs "yet again."  (*Id.* ¶ 26.)
- That same day, Corns informed the plaintiffs that he had spoken to an individual about bringing an industrial trucking operation to the property adjacent to plaintiffs.  (*Id.* ¶ 28.)
- After the April 22, 2015 meeting with Corns, Plaintiffs "strenuously pleaded" that Corns, Hampden, and Blackhawk not arrange for the property next to them to be so used as an industrial coal trucking operation.  (*Id.* ¶ 29.)
- Corns "demurred" to that plea and later reiterated his offer to help the plaintiffs relocate.  (*Id.* ¶¶ 29–30.)

mining and the commercial transportation of coal, and direct causes of action under each of these statutes.   Plaintiffs also seek punitive damages based on the "willful, wanton, malicious, reckless, oppressive, and/or criminally indifferent" conduct of the defendants.   (ECF No. 1, Ex. 1 ¶ 83.)

Plaintiffs originally filed this action in the Circuit Court of Logan County.   On November 25, 2015, Defendants filed a notice of removal invoking this Court's diversity jurisdiction.   In particular, Defendants assert that KC Transport is a Virginia corporation with principal place of business in Virginia and that both Blackhawk and Hampden are limited liability corporations organized under the laws of Delaware and having no West Virginia citizens as members.[6]   (ECF No. 1, ¶¶ 7–9.)   Further, although Defendants do not dispute that Defendant Gary Corns is a West Virginia resident, they argue that his citizenship can be disregarded for purposes of determining diversity jurisdiction under the doctrine of fraudulent joinder.   (*Id.* ¶ 10.)   On December 2, 2015, Corns filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs had failed to state a claim against him upon which relief can be granted.   (ECF No. 6.)   On December 16, 2015, Plaintiffs moved to remand, arguing that Defendants had failed to demonstrate either that KC Transport had its principal place of business outside of West Virginia or that Corns was fraudulently joined.   (ECF No. 11.)   The defendants filed a joint response in opposition on January 4, 2016, (ECF No. 18), and on March 25, 2016, filed a motion to supplement that response with certain discovery materials, (ECF No. 36).

---

[6] "For purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all of its members . . . ."  *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).   As noted above, Plaintiffs do not contest Defendants' jurisdictional allegations with respect to either Blackhawk or Hampden.

## II.     *Legal Standard*

Congress has provided a right of removal from state to federal court if a case could have originally been brought in federal court.  28 U.S.C. § 1441(a).  "Under 28 U.S.C. § 1332, a federal district court has original jurisdiction over all civil actions where the amount in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (citing 28 U.S.C. § 1332(a)(1)).  The Supreme Court has consistently read this statute to require "complete diversity," meaning that federal jurisdiction only exists in cases "in which the citizenship of each plaintiff is diverse from the citizenship of each defendant."  *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

Because federal courts are courts of limited jurisdiction, a defendant seeking to invoke federal jurisdiction through removal "carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter."  *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008).  Initially, this burden parallels a plaintiff's pleading burden and is not heavy: "just as a plaintiff's complaint sufficiently establishes diversity jurisdiction if it alleges that the parties are of diverse citizenship and that [the matter in controversy exceeds $75,000], so too does a removing party's notice of removal sufficiently establish jurisdictional grounds for removal by making jurisdictional allegations in the same manner." *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008) (citations omitted). However, once a plaintiff challenges jurisdictional allegations, "[t]he party seeking removal bears the burden of demonstrating that removal jurisdiction is proper."  *Id.* (alteration in original) (quoting *In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 583 (4th Cir. 2006)).  "When

8

removal is challenged, the defendant must establish jurisdiction by a preponderance of the evidence." *Southern v. Marion Cty. Coal Co.*, Civil Action No. 1:15CV171, 2015 WL 6964651, at *2 (N.D. W. Va. Nov. 10, 2015) (citing *Strawn*, 530 F.3d at 297–98).

In general, statutes providing for removal must be strictly construed "in light of the federalism concerns that animate the policy of strictly confining federal jurisdiction within the congressionally-set limits." *Ashworth v. Albers Med., Inc.*, 395 F. Supp. 2d 395, 402 (S.D. W. Va. 2005) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941)). "If federal jurisdiction is doubtful, a remand is necessary." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). At the same time, however, "[t]he very fact that Congress has provided defendants with the right of removal indicates that the removal right 'is at least as important as the plaintiff's right to the forum of his choice,' and the statutory right to removal should not be 'easily overcome by tactical maneuvering by plaintiffs.'" *Linnin v. Michielsens*, 372 F. Supp. 2d 811, 816–17 (E.D. Va. 2005) (quoting *McKinney v. Bd. of Trs. of Mayland Cmty. Coll.*, 955 F.2d 924, 927 (4th Cir. 1992)).

The fraudulent joinder doctrine is one means by which courts seek to prevent such tactical maneuvering and ensure that plaintiffs do not defeat removal jurisdiction through the improper naming of non-diverse defendants. The doctrine is an exception to the diversity requirement that "requires neither fraud nor joinder." *Evans v. CDX Sers., LLC*, 528 F. Supp. 2d 599, 602 (S.D. W. Va. 2007). Rather, "fraudulent joinder" is a "term of art," *AIDS Counseling and Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1003 (4th Cir. 1990) (citation omitted), that "permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse

defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain

jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999).

## III. Discussion

Plaintiffs' remand motion makes two arguments against removal jurisdiction in this case.

First, Plaintiffs argue that KC Transport has a principal place of business in West Virginia, making

it a citizen of the state and destroying complete diversity. This argument turns on whether

Defendants have provided sufficient evidence to carry their burden of demonstrating diversity of

citizenship. Second, Plaintiffs argue that Defendants Gary Corns is not fraudulently joined and

that as such his West Virginia citizenship should destroy diversity. For the reasons that follow,

the Court rejects both arguments, determines that complete diversity exists between Plaintiffs and

KC Transport, finds that Corns' citizenship is appropriately ignored under the fraudulent joinder

doctrine, retains jurisdiction, and dismisses Corns from this action.

## A.    KC Transport Citizenship

"For purposes of diversity jurisdiction, 'a corporation shall be deemed to be a citizen of

every State . . . by which it has been incorporated and of the State . . . where it has its principal

place of business.'" *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 170 (4th Cir. 2014)

(omissions in original) (quoting 28 U.S.C. § 1332(c)(1)). Under recent Supreme Court precedent,

a corporation's principal place of business is its "nerve center," i.e. "the place where a

corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v.

Friend*, 559 U.S. 77, 92–93 (2010). The nerve center will "normally be the place where the

corporation maintains its headquarters." *Id*. at 93. However, for a headquarters "to qualify as

the nerve center, it must be 'the actual center of direction, control, and coordination, . . . and not

simply an office where the corporation holds it board meetings.'"   *Hoschar*, 739 F.3d at 171 (omission in original) (quoting *Hertz*, 559 U.S. at 93).   In determining a corporation's nerve center in the wake of *Hertz*, the Fourth Circuit has looked to the place where the majority of corporate officers conduct their business, the principal place of business location listed on corporate filing documents, and the location at which officers make significant decisions and set corporate policy. *Van Lier v. Unisys Corp.*, 142 F. Supp. 3d 477, 481–82 (E.D. Va. 2015) (citing *Mountain State Carbon*, 636 F.3d at 104–05, 107 and *Hoschar*, 739 F.3d at 172).

"The burden of persuasion for establishing diversity jurisdiction [rests] on the party asserting it.   When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof."   *Turner v. Digital Broadcast Corp.*, 894 F. Supp. 2d 748, 751 (W.D. Va. 2012) (alteration in original) (quoting *Hertz*, 559 U.S. 96–97).   Provided that removal is procedurally proper, defendants may submit a wide range of evidence—including "their own affidavits, declarations, or other documentation"—in order to satisfy the jurisdictional requirements of removal.   *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 755 (11th Cir. 2010); *see also Dep't of Recreation & Sports of Puerto Rico v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir. 1991) (noting that a party may meet its burden of demonstrating federal jurisdiction by "submitting affidavits").

As noted above, a removing defendant seeking to invoke a federal court's diversity jurisdiction must allege that the jurisdictional requirements are met and, once challenged, demonstrate the existence of jurisdiction by a preponderance of the evidence.   Here, Defendants assert in their notice of removal that both KC Transport's place of incorporation and its principal place of business are in the Commonwealth of Virginia.   (*See* ECF No. 1 ¶ 7.)   In their original

11

complaint, Plaintiffs alleged that KC Transport has a principal place of business in West Virginia, (ECF No. 1, Ex. ¶ 2), and continue to challenge Defendants' assertion of jurisdiction in their remand motion.   Both parties have submitted evidence in support of these conflicting allegations. Despite Plaintiffs' contentions to the contrary, that evidence demonstrates that KC Transport's nerve center is in Virginia.   As such, diversity exists between that entity and the plaintiffs.

In support of their allegations regarding corporate citizenship, Defendants submit a sworn affidavit from Lynn Compton, KC Transport's president.   The affidavit makes the following representations: that KC Transport is incorporated in Virginia, that its "headquarters and principal place of business is in Virginia with a principal address of 8306 Wilderness Road, Bland, Virginia," that the Bland address is where KC Transport's officers "direct, control, and coordinate the corporation's activities," and in particular that the corporate officers responsible for setting corporate policy and overseeing significant corporate decisions "primarily perform their duties at KC Transport's headquarters in Bland, Virginia, which is also where they maintain an office and where KC Transport holds its board meeting."   (ECF No. 18, Ex. 1 ¶¶ 3–8.)   Ms. Compton's averments on their face demonstrate that Bland, Virginia is the place where KC Transport's high level officers direct, control, and coordinate the corporation's activities, a showing the Fourth Circuit has determined to be "the touchstone . . . for determining a corporation's principal place of business for diversity purposes."   *Mountain State Carbon*, 636 F.3d at 107.

Moreover, nothing in Plaintiffs' proffered evidence contradicts Ms. Compton's affidavit or otherwise suggests that KC Transport's principal place of business, as opposed to its locus for business operations, is in West Virginia.   Plaintiffs primarily point to a listing from the Mine Safety and Health Administration which, according to Plaintiffs, lists the Mingo No. 1 Mine as the

only mine in the nation for which KC Transport is registered to conduct mining business, (ECF No. 12 at 6), and further lists a West Virginia address for the corporation.   (ECF No. 11, Ex. 1.) Such evidence certainly suggests that KC Transport conducted operations in West Virginia.   That fact, however, is not disputed by the defendants and more importantly is irrelevant for purposes of determining a corporation's principal place of business.   *See Hoschar*, 739 F.3d at 172 ("Indeed, the corporation's day-to-day operations are not 'relevant to the nerve center test under *Hertz*.'" (quoting *Mountain State Carbon*, 636 F.3d at 105)).   As the case law makes clear, the question is not where a corporation conducts the majority of its business activities, but where that corporation's officers make the high level decisions directing those activities.   *See Hertz*, 559 U.S. at 96 ("[I]f the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the 'principal place of business' is New York."); *Hoschar*, 739 F.3d at 172 (noting that "if a corporation's day-to-day operations are managed in one state, while its officers make significant corporate decisions and set corporate policy in another, the principal place of business is the latter" (citing *Mountain State Carbon*, 636 F.3d at 106)).

Thus, even assuming *arguendo* that KC Transport conducted *all* of its on-the-ground operations in West Virginia, it could still have a nerve center, and thus principal place of business, in Virginia.   KC Transport avers that this was the case, and Plaintiffs submit a listing with the West Virginia Secretary of State that actually supports that conclusion.   In particular, the form registers KC Transport to do business in West Virginia and provides a local office address in the state, but lists the corporate entity's "principal office address" in Bland, Virginia.   (ECF No. 11, Ex. 2.)   Such a listing suggests that while KC Transport conducted business and even established

13

a local office in West Virginia, its "headquarters and principal place of business" is, as Ms. Compton avers, in Virginia.[7]   Based on all of this, the Court **FINDS** that KC Transport's principal place of business is in Virginia and accordingly that the defendants have sufficiently demonstrated diversity between that corporation and the plaintiffs.

## B.      Fraudulent Joinder

There is no dispute that Gary Corns is a West Virginia resident whose presence in the case would otherwise destroy diversity.   Here, however, Defendants assert that Corns is fraudulently joined, and that as such his citizenship should be disregarded for purposes of establishing jurisdiction.   The Fourth Circuit lays a "heavy burden" upon a defendant claiming fraudulent joinder.   *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 704 (4th Cir. 2015) (quoting *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999)).   "The removing party must show either 'outright fraud in the plaintiff's pleading of jurisdictional facts or that there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court.'"   *Id.* (quoting *Hartley*, 187 F.3d at 424).

This "rigorous standard" strongly favors the plaintiff.   *Id.*   It requires a showing not of ultimate success on the merits of the claim, but only of a "possibility of a right to relief" against the nondiverse defendant.   *Id.* (quoting *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 233 (4th Cir. 1993)).   In making this determination, the plaintiff is entitled to the resolution of all factual

---

[7] Plaintiffs' also submit documents that relate to the corporate citizenship of Appalachian Leasing, Inc., an entity that is apparently controlled by the same officers—Kenny and Lynn Compton—that serve as the primary officers of KC Transport.   Ms. Compton avers that Appalachian Leasing, Inc. "is not a parent, subsidiary, or affiliate of KC Transport and is a separate and distinct corporate entity from KC Transport."   (ECF No. 18, Ex. 1 at 2.)   Plaintiffs have offered nothing to dispute this contention or otherwise demonstrate why the corporate citizenship of a separate entity is relevant to determining KC Transport's principal place of business.   In any case, the citizenship of a given corporate entity must be determined on the basis of that entity's business activities alone.   *See Hoschar*, 739 F.3d at 173 n.4 ("Of course, we do not automatically impute a parent corporation's principal place of business to its subsidiary. Instead we focus on the location of direction, control, and coordination of the subsidiary's activities.").

and legal issues in her favor.  *Mayes*, 198 F.3d at 465.  The standard for fraudulent joinder is "even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)."  *Hartley*, 187 F.3d at 424; *see also Allard v. Laroya*, ---F. Supp. 3d---, 2016 WL 787375, at *1 n.2 (E.D. Va. Feb. 5, 2016) (noting that *Hartley* was decided before the Supreme Court's recent heightening of the federal pleading standard and thus that the Fourth Circuit's statement "was noting that the fraudulent joinder standard is higher than the old possibility standard of 12(b)(6)").  Fraudulent joinder claims are thus "subject to a rather black-and-white analysis in this circuit," with "[a]ny shades of gray . . . resolved in favor of remand."  *Adkins v. Consolidation Coal Co.*, 856 F. Supp. 2d 817, 820 (S.D. W. Va. 2012).  "Once the court identifies [a] glimmer of hope for the plaintiff, the jurisdictional inquiry ends."  *Hartley*, 187 F.3d at 426.

Given the "draconian" rigor of this standard, *Fleming v. United Teachers Assocs. Ins. Co.*, 250 F. Supp. 2d 658, 662 (S.D. W. Va. 2003), "fraudulent joinder is typically only found in cases of legal impossibility."  *Flores v. Ethicon, Inc.*, 563 F. App'x 266, 269 (4th Cir. 2014); *see also Kallman v. Aronchick*, 981 F. Supp. 2d 372, 380 (E.D. Pa. 2013) (noting that a "finding of fraudulent joinder is usually reserved for situations where recovery from the nondiverse defendant is a clear legal impossibility" (quoting *West v. Marriott Hotel Servs., Inc.*, Civil Action No. 10–4130, 2010 WL 4343540, at *3 (E.D. Pa. Nov. 2, 2010))).  Nonetheless, a complaint may be "so inadequate and the record so entirely lacking in factual support that [a court] can only reasonably conclude that the non-diverse defendants were added to defeat jurisdiction."  *Flores*, 563 F. App'x at 269.  In such cases, where the plaintiff fails to make any allegations that could allow a court to reasonably infer a cause of action, a finding of fraudulent joinder is appropriate.  *Id.* at 270; *see*

*also AIDS Counseling*, 903 F.2d at 1003 (noting that fraudulent joinder exists where no cause of action is stated against a nondiverse defendant).

As an initial matter, the Court notes that Defendants have moved to supplement their response to Plaintiffs' remand motion with certain discovery inquiries that they assert are deemed admitted by virtue of Plaintiffs' untimely responses.  Defendants argue that these admissions "confirm that no claim of any kind could exist or does exist against Mr. Corns and that his inclusion as a party in this action was fraudulent for purposes of determining this Court's jurisdiction." (ECF No. 36 at 1.)   In general, when determining the issue of fraudulent joinder, a court "is not bound by the allegations of the pleadings, but may instead 'consider the entire record, and determine the basis of joinder by any means available.'"   *AIDS Counseling*, 903 F.2d at 1004 (quoting *Dodd v. Fawcett Publ'ns, Inc.*, 329 F.2d 82, 85 (10th Cir. 1964)).   However, consideration of matters outside the pleading is discretionary, *see Flores*, 563 F. App'x at 269 (noting that a court is "only permitted, not required, to look beyond the complaint to determine the propriety of removal"), and the Court is mindful of the Fourth Circuit's recognition that permitting "extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdiction rules," *Hartley*, 187 F.3d at 425, and direction to "minimize threshold litigation over jurisdiction," *id*.   In this case, because inclusion of Corns in this case is "clearly improper," *id*., on the face of Plaintiffs' Complaint, the Court does not find it necessary to examine Plaintiffs' discovery responses or make any ruling as to their admissibility[8], and accordingly **DENIES** Defendants' motion to supplement their response to Plaintiffs' remand motion.   *See Allard*, 2016 WL 787375, at *2 (finding that while looking past the pleadings might be appropriate where a

---

[8] Plaintiffs did not respond to Defendants' motion and do not argue that their untimely answers to Defendants' requests for admission, if considered, would militate against a finding of fraudulent joinder.

16

plaintiff attempts to join a nondiverse party after removal, Fourth Circuit precedent does not support the proposition that such consideration is appropriate where "a plaintiff named a nondiverse defendant in its initial complaint in state court").

Turning to the substantive issue of fraudulent joinder, Defendants' notice of removal asserts that, "although Mr. Corns is identified as a party defendant in Plaintiffs' Complaint, the Complaint asserts no substantive claim against him that would allow this Court to grant the Plaintiffs any form of relief—monetary or extraordinary—against Mr. Corns."   (ECF No. 1 ¶ 13.) The Court agrees.   This is not a case where the plaintiffs have made only general and conclusory allegations against a particular defendant such that recovery would not be plausible under federal pleading standards but nonetheless possible under the more lenient standard for assessing fraudulent joinder.   Plaintiffs' allegations against Corns are clear and concrete.   The problem is the disconnect between the conduct described in those allegations and the conduct that would be required to state a cause of action under any of Plaintiffs' asserted theories—there is simply no nexus between Corns' alleged conduct and any actionable harm suffered by the plaintiffs.   Even construing Plaintiffs' allegations against Corns in the most favorable light, they do not identify any conduct on which a cause of action could be based.   Consequently, Defendants have carried their burden of showing that Plaintiffs have demonstrated no possibility of recovery against the non-diverse defendant.   *See Flores*, 563 F. App'x at 269–70 (finding fraudulent joinder where the plaintiffs failed to provide any "factual allegations in the complaint which would allow a court to reasonably infer" two necessary elements of a negligent failure to warn claim against non-diverse defendants); *Webb v. UnumProvident Corp.*, 507 F. Supp. 2d 668, 679–83 (W.D. Tex. 2005) (finding that defendants had carried their burden of establishing fraudulent joinder with respect to

17

certain of the plaintiff's claims where pleadings alleged that the non-diverse defendants engaged in conduct that was "not actionable" under the plaintiff's proffered theory of liability).

At bottom, Plaintiffs' case against Corns is that (1) in the past he helped negotiate a relocation agreement with the plaintiffs when the company he worked for became involved with a large-scale coal operation near the plaintiffs' old home; (2) it was intended that the home into which the plaintiffs moved as the result of that relocation agreement was to be free from coal-related industrial nuisance in the future; and (3) Corns now works for another company engaged in mining operations near the plaintiffs' new home and conducted relocation negotiations on behalf of that company with knowledge of the plaintiffs' prior history of relocation.   Every allegation against Corns is premised on his knowledge of that relocation history.   That knowledge alone, however, does not demonstrate that Corns was negligent, that he trespassed, that he created a nuisance, or that he violated statutory provisions regulating the cleaning of coal trucks and the placement of haul roads.   Plaintiffs do not allege the existence of any contract between themselves and Corns or a breach thereof, and outside of such a relationship there is no general duty of good faith that Corns could have breached by his actions in negotiating a relocation.   *See Corder v. Countrywide Home Loans, Inc.*, Civil Action No. 2:10–0738, 2011 WL 289343, at *3 (S.D. W. Va. Jan. 26, 2011) (noting that "the West Virginia Supreme Court of Appeals has declined to recognize an independent claim for a breach of the common law duty of good faith, and has instead held that such a claim sounds in breach of contract" (citations omitted)), *quoted with approval in Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 578 (W. Va. 2013).

Further, with respect to tort liability, "[a]n agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or

18

employee relationship." Syl. Pt. 5, *Courtless v. Jolliffe*, 507 S.E.2d 136 (W. Va. 1998). To the extent Plaintiffs allege that Corns can be held liable based on his managerial position at Blackhawk, the West Virginia Uniform Limited Liability Company Act provides that a member or manager of a limited liability company is not personally liable for the debts, obligations and liabilities of the LLC, whether arising in contract, tort, or otherwise, "solely by reason of being or acting as a member or manager." W. Va. Code § 31B–3–303(a); *see also* Syl. Pt. 3, *Bowling v. Anstead Chrysler-Plymouth-Dodge, Inc.*, 425 S.E.2d 144 (W. Va. 1992) (noting that a corporate officer can be liable for the tortious acts of the corporation only where that officer "participated in, approved of, sanctioned, or ratified such acts").

Thus, although the record is not entirely clear as to Corns' precise position at Blackhawk,[9] his liability depends on a showing that he either personally committed a tort against the plaintiffs or played some role in directing or approving of the tortious acts of the limited liability company with which he was associated. Plaintiffs do not allege, however, that Corns was responsible for any of Blackhawks' mining and transportation operations or that he was in any way affiliated with KC Transport. They assert only that he is a "land manager" and all allegations against him relate to his efforts to negotiate relocation agreements. Without some indication that Corns violated a legal duty owed to the plaintiffs and caused them harm on that basis, there can be no tort-based action against him. *See Kessel v. Leavitt*, 511 S.E.2d 720, 752 (W. Va. 1998) ("[T]he mere impingement of a legal right is not enough to create an automatic right of recovery in tort. 'There

---

[9] Presumably, Corns is not a member of the limited liability company because he is a West Virginia citizen and Defendants' assert that "[n]one of Blackhawk's members are citizens of West Virginia." (ECF No. 1 ¶ 9.) Plaintiffs do not contest this assertion or otherwise allege that Corns is a Blackhawk member.

must also be a violation of a duty recognized by law[.]'" (alteration in original) (quoting *W. Va. Transp. Co. v. Standard Oil Co.*, 40 S.E. 591, 592 (W. Va. 1902))).

Plaintiffs' Complaint asserts seven counts, all directed against "defendants" generally. Only one of these counts, however, references any of the allegations made against Corns: the claim for punitive damages.   There, the Plaintiffs allege that the defendants—and given the allegations in the Complaint, Corns in particular— "know full and well that the Peters have repeatedly had to move their home in response to the actions of the coal industry on Buffalo Creek" and yet "refused to negotiate in good faith with the Peters to attempt to limit the interference and annoyance caused by the Staging Area and the coal truck traffic on Accoville Hollow Road."   (ECF No. 1, Ex.1 ¶ 79).   This allegation captures the essence of the plaintiffs' grievance with Corns: that he knew what they had been through and played some role in again allowing their lives to be disrupted by coal-related operations.   However, there is simply nothing in the record demonstrating that Corns himself had anything to do with that disruption other than serving as the face of relocation negotiations both in 2005 and 2015.   Moreover, to the extent Plaintiffs attempt to assert an independent cause of action for punitive damages, such damages are "a form of relief" and "West Virginia law does not recognize an independent cause of action for punitive damages."   *Miller v. Carelink Health Plans, Inc.*, 82 F. Supp. 2d 574, 579 n.6 (S.D. W. Va. 2000) (citing *Cook v. Heck's Inc.*, 342 S.E.2d 453, 461 n.3 (W. Va. 1986)).   In order to recover punitive damages against Corns, Plaintiffs would have to first demonstrate some viable underlying cause of action against Corns. As described generally above, and discussed in more detail below, Plaintiffs' Complaint does not even create a glimmer of hope of recovery against Corns on any of the asserted tort theories.

20

Plaintiffs' nuisance allegations are based almost entirely on allegations regarding KC Transport's business operations.  Plaintiffs do not allege that Corns exercised any control over those operations, and affirmatively state that it was Kenny Compton who "acted as a general manager of the business" and "maintained a general presence on the site in a supervisory capacity, managing the workforce and the traffic of the trucks for KC Transport's business."[10]   (ECF No. 1, Ex. 1 ¶ 34.)   It is true that Blackhawk and Hampden played some role both in creating the coal traffic that necessitated KC Transport's presence next door to the plaintiffs and in negotiating the location of KC Transport's business.    Plaintiffs make much of this fact in their briefing in support of remand, primarily contending that a nuisance claim is stated against Corns based on allegations that he "exercised his own personal initiative to coordinate the placement of an industrial trucking facility on property that he had previously arranged for the Plaintiffs to move to based on Corns' personal representation that there would be no industrial activity in the subdivision."   (ECF No. 12 at 4.)

For one, Plaintiffs' Complaint does not actually allege that Corns did this, only that he "held a meeting with an individual named Kenny Compton regarding the possibility of bringing an industrial trucking operation to the property immediately adjacent to [Plaintiffs'] new home." (ECF No. 1, Ex. 1 ¶ 28.)   Such an allegation does not suggest that Corns "exercised his own personal initiative" to do anything other than negotiate with the plaintiffs to help them avoid the potentially undesirable effects of living beside the contemplated trucking operation.   Moreover, even if it was the case that Corns, as the land manager of a mining operation, personally

---

[10] It is perhaps telling that the plaintiffs name Corns as a defendant, despite his attenuated connection to the conduct causing their harm, but not Compton, a Virginia resident with direct responsibility over the activity alleged to have created the nuisance.

21

coordinated the location of KC Transport's staging area, this does not demonstrate that Corns individually had any role in causing the alleged nuisance.   In West Virginia, "[a] private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land."   Syl. Pt. 1, *Hendricks v. Stalnaker*, 380 S.E.2d 198 (W. Va. 1989).   Moreover, "a nuisance is a tort, which is governed by the rules relating to torts generally," meaning that a nuisance claim encompasses traditional tort elements such as causation and legal harm.   *Carter v. Monsanto Co.*, 575 S.E.2d 342, 347 (W. Va. 2002) (quoting 58 Am. Jur. 2d *Nuisances* § 66 (1989)); *see also* Restatement (Second) of Torts §822 (1979) (noting that a person is "subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land").

There is no possibility that a West Virginia court would find that Corns' actions, as alleged in the Complaint, were the legal cause of any invasion into the plaintiffs' private use and enjoyment of land.   The "obnoxious industrial noises" and "fumes" about which Plaintiffs complain, (ECF No. 1, Ex. 1 ¶ 55), were caused by the operations of KC Transport.   Moreover, the coal dust and dirt alleged to have been "escap[ing] from and fly[ing] off of coal tucks on Accoville Hollow Road," (*id*. ¶ 56), was caused by the Blackhawk and Hampden coal running operation.   The Complaint does not allege that Corns personally oversaw the running of coal or had anything to do with cleaning or covering coal trucks.   At most, Corns engaged the plaintiffs in discussions about moving to avoid the nuisance created by these business operations.   Regardless of what he knew about the plaintiffs' prior experiences moving away from coal-related industrial nuisances, his actions in negotiating cannot be said to have caused any nuisance and there is not a glimmer of hope that the plaintiffs could recover against Corns on such a theory.

22

Similar reasoning dooms the plaintiffs' remaining claims. The essence of a trespass claim in West Virginia is "an entry on another man's ground without lawful authority, and doing some damage, however inconsiderable, to his real property." *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 352 (W. Va. 1945). Plaintiffs' trespass claim is premised on the deposits of coal dust that have accumulated on their land as the result of the defendants "leaving their coal trucks uncovered, and failing to adequately clean their coal trucks." (ECF No. 1, Ex. 1 ¶ 59.) As discussed above, there are no allegations suggesting that Corns exercised any control over the coal mining defendants' coal running operation or had any responsibility for ensuring that the trucks were cleaned and covered. Accordingly, because there is nothing to tie Corns individually to the trespass, Plaintiffs' can show no possibility of recovery against him on that theory.

"To prevail in a negligence suit, the plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff." *Strahin v. Cleavenger*, 603 S.E.2d 197, 205 (W. Va. 2004) (citing *Webb v. Brown & Williamson Tobacco Co.*, 2 S.E.2d 898, 899 (W. Va. 1939)). "In order to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken." Syl Pt. 1, *Parsley v. Gen. Motors Acceptance Corp.*, 280 S.E.2d 703 (W. Va. 1981). A key element of establishing duty in a negligence case is the foreseeable risk of harm created by the defendant's conduct: "[i]t is well established that one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm." *Robertson v. LeMaster*, 301 S.E.2d 563, 567

23

(W. Va. 1983).   As for causation, West Virginia law defines proximate cause as "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred."   Syl. Pt. 3, *Webb v. Sessler*, 63 S.E.2d 65 (W. Va. 1950).

In their briefing, Plaintiffs argue in favor of a negligence claim on the basis that "Corns had a duty to the Plaintiffs, which he violated, to manage his business affairs in a prudent fashion that would not cause harm to the neighbors."   (ECF No. 12 at 4.)   What the Complaint asserts, however, is that the defendants breached their duty "to operate their businesses in a prudent fashion," (ECF No. 1, Ex. 1 ¶ 62), by "failing to clean the dust and dirt off their coal trucks, by failing to properly construct the haul road so that it connected directly to a major coal shipping route," and "by opening and operating an industrial truck Staging Area in a residential subdivision known by the Defendants to have been created via a common plan of development that expressly precluded industrial usage," (*id*. ¶ 63).   There are no allegations that Corns personally breached any contracts or covenants associated with Plaintiffs' property, or otherwise played any role in causing any of this activity to take place.   The Complaint simply details no "affirmative conduct" on the part of Corns that created "an unreasonable risk of harm to another," thus placing him under a duty to "exercise reasonable care to prevent the threatened harm."   *Robertson*, 301 S.E.2d at 567.

Even if such a duty did exist, there is nothing indicating that any action Corns took proximately caused any harm to the plaintiffs.   Plaintiffs' Complaint asserts harm suffered as the result of actions taken by the defendant business organizations in operating a nuisance and failing to properly manage their coal-hauling traffic.   It asserts that Corns attempted to negotiate a

relocation agreement with the plaintiffs despite knowing that they had already been forced to relocate for similar reasons. It asserts nothing connecting the former harm to the latter action and accordingly does not establish any possibility of recovery against Corns in common law negligence. Further, although the violation of a statute is "prima facie evidence of negligence" in West Virginia, *Arbaugh v. Bd. of Educ., Cty. of Pendleton*, 591 S.E.2d 235, 239 (W. Va. 2003), a person cannot be liable on such a theory unless he actually causes the statutory violation at issue. Again, Plaintiffs' allegations do not provide any basis on which a West Virginia court could hold Corns liable for any conduct alleged in the Complaint, including the alleged statutory violations. Accordingly, there is no possibility that Plaintiffs could prevail either on a negligence claim or on a direct cause of action under any cited statute.

Based on the foregoing, the Court **FINDS** that the defendant Gary Corns was fraudulently joined. Given that the standard for fraudulent joinder is "even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)," *Hartley*, 187 F.3d at 424, the Court **GRANTS** Corns' motion to dismiss, (ECF No. 6), for the same reasons stated above and **DISMISSES** Corns as a defendant in the present action.

## C.    *Burford Abstention*

Given the above rulings, the Court determines that complete diversity exists in this matter and that federal jurisdiction is appropriate. Nonetheless, as an alternative argument in their remand motion, Plaintiffs urge this Court to nonetheless decline to exercise that jurisdiction based on the *Burford* abstention doctrine.[11]

---

[11] This doctrine gets its name from the Supreme Court decision first announcing it, *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

In general, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see also Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (describing a federal court's "virtually unflagging obligation" to exercise the jurisdiction given them). "The *Burford* abstention doctrine relaxes the otherwise 'unflagging' mandate of Article III when an adjudication may undermine the 'independence of state action' on issues that are local and important to a state's sovereignty." *Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 (4th Cir. 2013) (citing *Quackenbush*, 517 U.S. at 728). Abstention is discretionary, *see First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002), and permitted under *Burford* only where:

> federal adjudication would 'unduly intrude' upon 'complex state administrative processes' because either: (1) 'there are difficult questions of state law . . . whose importance transcends the result in the case then at bar;' or (2) federal review would disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (omission in original) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361–63 (1989) ("*NOPSI*")).

This abstention doctrine "is concerned with protecting complex state administrative processes from undue federal interference," *NOPSI*, 491 U.S. at 362, and represents an "extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it," *Quackenbush*, 517 U.S. at 728 (citation omitted). *See also Skipper v. Hambleton Meadows Architectural Review Comm.*, 996 F. Supp. 478, 481 (D. Md. 1998) (noting that *Burford* abstention is "inapplicable" where a case "does not involve a state regulatory scheme of any kind"). "*Burford* abstention is rarely, if ever, appropriate when 'the state law to be applied appears to be settled.'" *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 362 (7th Cir. 1998) (quoting *Colorado River*, 424 U.S. at 815).

26

As documented above, this matter is a private dispute in which Plaintiffs assert traditional common law tort claims for injuries suffered in their capacity as landowners. Adjudication of those claims requires application of well-established principles of common law liability, regarding duty, breach, causation, and reasonable behavior, that form the "daily bread of a federal court sitting in diversity." *Safeway, Inc. v. Sugarloaf P'ship, LLC*, 423 F. Supp.2d 531, 537 (D. Md. 2006). Plaintiffs seek no review of any official state policy or administrative scheme or proceeding. *See Fragoso v. Lopez*, 991 F.2d 878, 883 (1st Cir. 1993) (finding *Burford*'s relevance "questionable" in case in which the court was "not being asked to review the actions or decisions of any state body, be it judicial or administrative"). Simply stated, none of the traditional concerns that animate *Burford* abstention are present here; if abstention were required in a case like this, the Court struggles to imagine a diversity case in which the exercise of federal jurisdiction would be proper. The Court does not deem its "virtually unflagging obligation," *Colorado River*, 424 U.S. at 817, to exercise properly conferred jurisdiction so easily overcome and accordingly **FINDS** abstention on the basis of the *Burford* doctrine unwarranted in this case.

### IV.    Conclusion

For the reasons discussed herein, the Court **FINDS** that federal jurisdiction exists and that *Burford* abstention is inappropriate. The Court **DENIES** Plaintiffs' remand motion, (ECF No. 11), and Defendants' motion to supplement their response to that motion, (ECF No. 36), and **DENIES AS MOOT** Plaintiffs' motion for expedited consideration of their remand motion, (ECF No. 31). The Court **GRANTS** Defendant Gary Corns' motion to dismiss, (ECF No. 6) and **DISMISSES** Corns as a party to the present action.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        August 29, 2016

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

28